### Petition of PLANT CITY NATURAL GAS CO.
Docket No. 770150-GV.   Order No. 8235.

Florida Public Service Commission.

March 30, 1978.

Robert S. Edwards, Plant City, for the petitioner.

Joseph A. McGlothlin, for the commission staff and the public generally.

The following commissioners participated in the disposition of this matter — PAULA F. HAWKINS, Chairman and Commissioners WILLIAM T. MAYO and ROBERT T. MANN.

BY THE COMMISSION.

Pursuant to notice, the commission through its duly designated hearing examiner, John Marks, conducted a public hearing on this matter on January 17, 1978, in Plant City.

Plant City Natural Gas Company is a public utility within the definition of Section 366.02, Florida Statutes, and operates under the jurisdiction of this commission. The utility serves approximately 750 customers in the vicinity of Plant City. Plant City Natural Gas Company ("the company") has operated since 1958, since it acquired the system from the city of Plant City. Other than a request for an increase in turn-on and turn-off fees that was approved in 1976, the company has operated with the rates which originally were in existence.

On August 1, 1977 the company petitioned for approval of proposed rate schedules designed to generate $116,000 in additional revenues annually. In its petition, the company contended that it is entitled to earn on its investment a rate of return of 13.50%, including a 14.50% return on equity capital. By Order No. 7941, dated August 31, 1977, we exercised our statutory authority to suspend the proposed schedules, pending further proceedings in this docket. A public hearing was held in Plant City on January 27, 1978. At that time, the company offered the testimony and exhibits of Joseph Hermann, Jr. and David Wilson in support of this petition. Shortly before the hearing, the company's request was amended to a total of $121,875 per year in increased revenues. After analyzing the record compiled in this docket, we are of the opinion the company's petition should be granted in part.

### The rate base

Plant City Natural Gas Company has proposed, and we have utilized, the use of an average rate base for ratemaking purposes in this proceeding.

Prior to the test period, the commission concluded an in-depth study of the company's plant in service to determine that rate base items are properly recorded at original cost, and specified in accordance with the Uniform System of Accounts. Subsequent audits have been performed to insure that the company's plant additions

and retirements had been properly recorded. Because of the extensive amount of prior work in this area, no adjustments were found to be necessary to the calculation of rate base presented by the company in this proceeding. In addition, because the company rents its office and warehouse space and has no "common use" property, no allocations between utility and non-utility operations are necessary. The only adjustment to rate base needed is a mechanical one resulting from certain adjustments to operating expenses explained below. The impact of such adjustments upon the cash working capital allowance result in reducing that item by $3,743. The rate base, then, is as follows —

PLANT CITY NATURAL GAS COMPANY
RATE BASE
December 31, 1976

Rate Base per company ..................... ...... $341,953
Adjustments:
    1/8 O & M Expenses ........................:..... (3,743)
Adjusted Rate Base .. ..................... ......... $338,210

*Net operating loss*

The company calculated a net operating loss for the test period in the amount of $67,227. Our adjustments to the company's calculation may be summarized as follows —

PLANT CITY NATURAL GAS COMPANY
NET OPERATING INCOME (LOSS)
FOR THE 12 MONTHS ENDING 12/31/76

N. O. L. per company (revised) .................................. $(67,227)
Adjustments:
| | | |
|---|---|---:|
| A. | Revenues (net) ..................... ... ... ... . | $ 3,871 |
| B. | Postage Expense ............. ............. ......... | 370 |
| C. | Allocation of A & G Salaries ..... ......... | 6,147 |
| D. | Annual Cost of Obtaining Financing .... | 1,000 |
| E. | Life Insurance Premiums ...... .. . ......... | 3,796 |
| G. | Computer Billing System ............ ......... | 1,287 |
| H. | Audit Fees ..................... . ......... ......... | 1,876 |
| I. | Loss from Disposition of Plant ........... | 478 |
| J. | Insurance Expense ............ ...... . ... ....... | 1,497 |
| K. | Depreciation Expense . ..... ................... | 2,197 |
| L. | Promotion Expenses ...... ........ .. ..... .... | 17,500 |
| M. | Communications Expenses .. ...... ... ....... | 1,247 |
| | | $ 41,451 |

Adjusted N. O. L. ................. ....................................... $(25,776)

### A. *Annualized revenues:*

During the test year, the company was granted authority to increase its turn-on/turn-off charges and to add a revenue tax multiplier to its purchased gas adjustment (PGA) clause. Accordingly, test year revenues must be adjusted to annualize the increased revenues generated by the items approved during the year. The company's witness agreed that it is proper to increase test period revenues by $3,871 to account for these items.

### B. *Postage expense:*

The company made a pro forma adjustment to recognize increases in postage expense in the amount of $370. Because such increases did not materialize, the company agreed that the pro forma adjustment should be eliminated.

### C. *Administrative and general salaries:*

During January and February of the test period, the company failed to allocate salaries of the president, chief executive officer and bookkeeper. During the balance of the year, the company properly allocated these salaries between regulated and non-regulated opeartions. In addition, the company made pro forma adjustments for salary increases to these individuals, but failed to allocate a portion of the increases to the non-regulated operations. An application of the omitted allocations results in reduced test period and pro forma expenses in the amount of $6,147.

### D. *Annual cost of financing:*

The company provided a pro forma adjustment in the amount of $1,000 to cover the cost of an annual trip to Boston for the purpose of holding discussions with a bank where a company line of credit is maintained. However, the company was unable to demonstrate that the annual visit is a condition or requirement imposed by the bank to maintain the line of credit. As the trip expense is not a known increase in expenses, it must be disallowed for ratemaking purposes.

### E. *Life Insurance premiums:*

During the test period, the company expensed $3,796 for life insurance premiums on a policy covering the president of the company. The beneficiary of the $100,000 policy is Joe Hermann, Inc., a now defunct LP gas and merchandising company. We regard such premiums as an unreasonable form of compensation to the president which should be disallowed for ratemaking purposes.

### F.  *Capital stock tax:*

During the test period, the company paid to the state $195 for capital stock tax, including $185 applicable to the past four years. Since this amount constitutes an out-of-period expense, test period expenses must be reduced by $185.

### G.  *Computer billing system:*

The company made a pro forma adjustment estimating the cost of the computer billing system. An audit determined that the actual cost of the system will be lower than the company's estimate by $1,287. Accordingly, we have reduced test period expenses by that amount.

### H.  *Audit fees:*

The company estimated that 1977 audit fees would increase by $1,876 over the 1976 amount. However, it appears that the actual expenses for 1977 equal those for 1976. Therefore, we are disallowing the pro forma adjustment for audit fees, thereby reducing test year expenses by $1,876.

### I.  *Loss from disposition of plant:*

The company included in net operating income $478 to account for the loss of tools during the test year. The company's witness agreed that this accounting treatment of the loss was improper and should be disallowed.

### J.  *Insurance expense:*

During the test period, the company mistakenly expensed $1,497 for insurance premiums relating to the affiliated LP gas companies' operations. The accounting witness agreed that this item should be disallowed for ratemaking purposes.

### K.  *Depreciation expenses:*

As a result of reconstruction of the company's entire utility plant records, a slight error was made in its computation of depreciation expense. The accounting witness appearing for the company agreed that the company's calculation should be adjusted downward by $194.

In addition, the company proposed a proforma adjustment in the amount of $2,003 for depreciation expense associated with a line extension. In past rate cases this commission has allowed pro forma depreciation expense on non-revenue producing line extensions that have been mandated by state or federal regulations. However, in this instance, it appears that this line will be used to attach new customers and will therefore generate additional revenues for

the company. Therefore, pro forma depreciation expense is not warranted.

The net effect of adjustments to the company's calculation of depreciation expenses to reduce test year expenses by $2,197.

### L.  *Promotion expenses:*

The company proposed a pro forma operating expense in the amount of $17,500 for promotional expenses and installation allowance for inresidence piping. Although the company has experienced no promotional expenses during the past five years, it proposes to hire an individual to oversee a promotional campaign. Under the provisions of the general investigation of promotional practices of gas utilities, Docket No. 73568-GU, this commission removed for ratemaking purposes all forms of advertising designed to obtain new customers, increase appliance saturation, increase customer loads, or encourage persons to switch to gas from other energy sources. Consistent with the policy adopted in that docket, and in view of the fact that the company has not experienced promotional practice expenses in recent years, we have determined that the proforma adjustment for that purpose must be disallowed. Thus, operating expenses for the test year period are reduced by $17,500.

### M.  *Communication expense:*

The company originally proposed a pro forma adjustment to cover the cost of communication equipment which it wishes to acquire. By Exhibit No. 8, the company revised the pro forma adjustment for communication equipment to the amount of $2,992, an increase of $1,412. The increase over the original amount stems from the fact that the company plans to lease a tower for the antenna from Motorola Corporation, and also proposes more powerful and more expensive equipment than was initially contemplated. Late filed Exhibit No. 5, a cost proposal pertaining to the equipment originally identified, indicates that less expensive equipment adequate for the company's needs is still available — at a slightly higher cost than originally proposed — as an alternative. Accordingly, we have adjusted the pro forma communications expense by reducing expenses in the amount of $1,247.

### *Cost of capital*

Mr. David E. Wilson, who appeared as the chief accounting witness for Plant City Natural Gas Company, also testified in the general area of the company's cost of capital and desired rate of return. Mr. Wilson, a certified public accountant, did not claim to be an expert in the field of determining a fair rate of return. However, he offered the opinion that Plant City should be permitted

to earn 14.50% on its equity capital and 13.50% on total capital. His recommendation was based upon the commission's 1975 City Gas Company's rate case order, in which this commission allowed City Gas Company a 14.50% return on equity and a 9.23% overall return. Mr. Wilson pointed out that Plant City was smaller than City Gas, and argued that it should therefore receive a higher return on equity capital.

In our opinion, Mr. Wilson overstated the cost of equity capital applicable to Plant City Natural Gas Company. His comparison with City Gas Company overlooked the marked differences in financial risk to which the companies are exposed. In fact, at the time of the City Gas order cited by Mr. Wilson, that company had a capital structure of 58% debt and 42% equity. Plant City, on the other hand, has 34.5% debt and 65.5% equity. Furthermore, all long term debt of Plant City is owned and controlled by the sole stockholder, which would operate to further lower the financial risk to which Plant City Natural Gas Company is exposed. Giving consideration to these factors, it is our judgment that an 11.50% return on equity capital is fair and reasonable at this time. Application of this return on equity capital results in an overall rate of return of 11.27%, determined as follows —

### PLANT CITY NATURAL GAS COMPANY
#### Capital Structure & Cost of Capital
#### 1976

| Class | Amount | Capitalization Ratio | Cost Rate | Weighted Component |
|---|---|---|---|---|
| Long-term debt | $103,500 | 33.40% | 11.36% | 3.79% |
| Customer deposits | 10,147 | 3.27 | 6.00% | .20% |
| Common stock equity | 196,267 | 63.33 | 11.00%-11.50%-12.00% | 7.28% |
| Totals | $309,914 | 100.00% | Midpoint | 11.27% |
| | | | Floor | 10.96% |
| | | | Ceiling | 11.59% |

*Revenue deficiency*

Having determined the company's rate base value, its net operating loss for the test period, and the fair rate of return it should be authorized to earn on its investment, the additional annual revenues which the company should be authorized to receive can be easily calculated. Accordingly, we find and conclude that Plant City Natural Gas Company should be permitted to implement rate schedules designed to generate $72,575 in additional annual revenues.

### Rate schedules

In presenting its case, Plant City Natural Gas Company proposed to provide a separate air conditioning rate schedule. At the present time, the company has five "general service" customers who have gas air conditioning. In that the company's proposal would allow air conditioning customers to receive gas at a lower rate than the rate charged other customers with similar use characteristics, the proposed rate is promotional in nature. Accordingly, we deny the company's proposal to provide a separate air conditioning rate schedule.

### *Residential and commercial customers —*

The company presently provides gas service to both residential and small commercial customers under a single general service rate schedule. Such mixing of customers classes should be allowed only when usage and cost characteristics are the same. Such is not the case here; while the company has made no specific cost analysis, it did indicate that the usage characteristics are different for residential and commercial customers presently included on the general service rate. For that reason, we direct the company to abolish the present general service rate schedule and establish separate rate schedules for residential and small commercial customers. The residential rate schedule should be designed to include a customer facilities charge devoid of any consumption and a three-step energy charge.

### *Large commercial and boiler fuel rates —*

The company presently has a large commercial rate, and a separate rate schedule entitled boiler fuel rates. Both rates are for commercial customers having essentially the same usage patterns. The company could foresee no problems in combining such customers into a single rate schedule. Accordingly, we direct the company to combine both large commercial and boiler rate customers into a single commercial rate schedule, to include the commercial customers presently served on the general service rate. The commercial rate schedule should consist of a customer facilities charge and a two-step energy charge.

### *Special contract customer —*

In the prepared rate schedules submitted with its case, the company proposed no increase to its special contract customer, the city of Plant City. The witness, Mr. Hermann, stated that the present price of gas furnished the city was established at the time the company's franchise rights were obtained from the city. However, the witness added that the company has no objection to placing a por-

tion of the increase upon the city. The franchise ordinance which set the existing price in fact acknowledged the authority of the proper regulatory agency to alter the price established by its terms. Accordingly, we have determined that the city customer should bear an equitable portion of the rate increase, and direct the company to prepare rate schedules reflecting the increase indicated below.

*Purchased gas adjustment level —*

As has been our policy in recent cases, we direct the company to roll the existing level of the purchased gas adjustment into the base rates of the revised rate schedules prepared to conform to the requirements of this order. This modification will reflect the current level of the cost of gas on the effective date of the new rate schedules.

*Distribution of revenues —*

We direct that the revenue increase authorized herein be distributed to base rate revenues by applying the following percentage increases to the various classes of customers —

| | |
|---|---|
| Residential | 23.13% |
| Commercial | 24.95% |
| Interruptible | 21.72% |
| City contract rate | 23.18%. |
| Overall | 23.13% |

*Availability of natural gas for interruptible customers*

Natural gas distribution companies under the commission's jurisdiction have been faced with varying degrees of curtailment of interruptible gas. As an example, Plant City Natural Gas Company experienced 64 days of curtailment during the test period, with a corresponding loss of gross revenues of approximately $48,000 or net revenues of $16,000. In 1977, the company experienced curtailment on 41 days, largely during January and February of 1977. In contrast, there have been no curtailments for Plant City during the 1977-78 winter season.

Recently, the Federal Energy Regulatory Commission ordered Florida Gas Transmission Company to submit a new curtailment plan for its consideration and approval. If the plan proposed by Florida Gas Transmission is adopted, several of the distribution companies under our jurisdiction will lose a substantial amount of gas, while others will gain additional gas. Under the proposed plan, Plant City Natural Gas Company will not be curtailed and will gain from a financial standpoint.

In addition to the above considerations, certain companies have interruptible customers on a negotiable contract rate. With the price of alternate fuels rising, such companies conceivably could negotiate higher rates for interruptible gas. This of course would work to the advantage of the firm customers of the company, since such a company could thereby delay any need to request an increase in firm rates.

Due to the above, companies such as Plant City Natural Gas Company could theoretically experience drastic fluctuations in revenues and related rates of return strictly because of reduced or increased curtailment. Under existing procedures, the only recourse available to the company or this commission is a rate-making proceeding instituted for the purpose of reducing or increasing rates to modify the company's experienced rate of return.

We are aware that certain other jurisdictions have explored the feasibility of establishing an "interruptible sales fund" as an alternative to the multitude of utility rate cases which would otherwise be necessary because of the interruptible gas situation. This concept envisions the establishment of a bank account which would be funded when volumetric sales to interruptible customers exceed a base level or when contracts are renegotiated, resulting in increased revenues and a correspondingly excessive rate of return. The purpose of such a fund would be to provide a means of minimizing the drastic fluctuations in the earned rate of return which a company might otherwise experience through severe variations in the supply of interruptible gas. Excessive earnings resulting from increased sales of interruptible gas would be deposited in a fund, which would be restricted in terms of the company's ability to draw upon the revenues deposited therein. One appropriate circumstance, of course would be to improve cash flow during those periods in which the company has little interruptible gas to sell.

The concept was discussed by witness Wilson, who, while expressing reservations concerning the problems of administering the fund and the involvement of the commission in managing the company's capital, acknowledged that the fund could possibly serve as an alternative to more frequent rate cases.

We believe the concept of the interruptible fund has sufficient merit to warrant investigating the possibility further. We recognize, however, that the concept gives rise, not only to the problems identified by Mr. Wilson, but to basic legal and policy issues as well. Accordingly, we have determined to retain jurisdiction in this docket until such time as we have had a full opportunity to consider the merits and issues of the interruptible sales fund through a rulemaking proceeding or other appropriate procedural vehicle.

*Additional findings and conclusions*

In addition to the foregoing, we find and conclude as follows —

1. That Plant City Natural Gas Company is a public utility subject to the jurisdiction of this commission;

2. That the value of the company's rate base devoted to public service is $338,210;

3. That the company experienced during the test period designated in this proceeding a net operating loss of $25,776;

4. That the range of 11% - 12% constitutes a fair and reasonable return on common equity of Plant City Natural Gas Company at this time;

5. That the overall fair rate of return which the company should be authorized to earn lies in the range of 10.96% - 11.59%, with a focus on the midpoint of 11.27%;

6. That the company is entitled by law to receive additional revenues in the amount of $72,575 annually;

7. That all the above adjustments to the company's calculation of net operating loss are reasonable and proper;

8. That the rate schedules authorized and described herein constitute fair, just, and reasonable rates within the meaning of law, and represent a fair and equitable manner of distributing the increase authorized herein among the various classes of customers.

Accordingly, it is ordered that all findings of fact and conclusions of law expressed herein are hereby approved.

It is further ordered that the petition of Plant City Natural Gas Company be and the same is hereby granted to the extent provided herein.

It is further ordered that Plant City Natural Gas Company is hereby authorized to file rate schedules consistent herewith designed to generate additional annual revenues of $72,575, said schedules to become effective on bills rendered for meter readings made on and after April 24, 1978.

It is further ordered that the company include in each bill during the first billing cycle during which this increase is effective a bill stuffer explaining the nature of the increase and the reasons therefore. Said bill stuffer shall be submitted to the commission's rate department for approval prior to implementation.

It is further ordered that the commission retains jurisdiction in this docket until such time as the concept of the fund for interruptible sales has been fully considered.